UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| MAGNOLIA POINT MINERALS, LLC | CIVIL ACTION NO. 11-00854 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CHESAPEAKE LOUISIANA, LP AND PXP LOUISIANA L.L.C. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court are cross motions for partial summary judgment filed by plaintiff Magnolia Point Minerals LLC ("Magnolia") (Record Document 23) and defendant Chesapeake Louisiana, LP ("Chesapeake"). (Record Document 31). The co-defendant, PXP Louisiana, LLC ("PXP"), has opposed only Magnolia's motion. (Record Document 30). For the reasons that follow, Chesapeake's Motion for Partial Summary Judgment is **GRANTED** (Record Document 31) and Magnolia's Motion for Partial Summary Judgment (Record Document 23) is **DENIED**.

## BACKGROUND

On April 11, 2008, Robert Smitherman ("Smitherman") sent a request for proposal ("RFP") to Chesapeake indicating his interest in leasing the mineral rights to his 447.7 acre tract in Caddo and Bossier parishes.(Record Document 43 at 1). On May 6, 2008, Matthew Smitherman, one of the attorneys representing Smitherman, mailed a bid proposal package to Chesapeake. See id. This bid proposal package invited Chesapeake to submit a bid to lease or purchase the minerals on Smitherman's land. (Record Document 43 at 2). Chesapeake did submit a bid to lease the mineral rights to Smitherman's land and, on May 21, 2008, Smitherman granted an oil, gas, and mineral lease ("Lease") in favor of Chesapeake. (Record Document 23-3 at 8). The Lease

consisted of a "paid up lease" form provided by Chesapeake, nine separate changes to the proposed lease form offered by Smitherman, and an Exhibit, containing nineteen provisions, drafted by Smitherman. (Record Document 43 at 2-3). Chesapeake later transferred an undivided twenty percent (20%) interest in the Lease to PXP Louisiana L.L.C. ("PXP"). See id. On December 30, 2008, Smitherman "conveyed all of his [personal] interest in the oil, gas, sulphur, lignite, coal and other minerals subject to the Lease" to Plaintiff, Magnolia Point Minerals L.L.C. ("Magnolia"). This is Smitherman's L.L.C. See id. Therefore, Magnolia is the current owner of a mineral servitude covering all of the oil, gas, and mineral rights subject to the Lease and is entitled to all royalty payments in accordance with the Lease. See id.

After a dispute arose regarding the payment of royalties under the Lease, Magnolia filed the above captioned matter seeking "an accounting for and payment of all royalties" and for damages for the late payments or underpayments of these royalties. (Record Document 1-1 at 12). Further, Magnolia is seeking to have the Lease dissolved. (Record Document 1-1 at 13). Magnolia has filed a Motion for Partial Summary Judgment (Record Document 23) and Defendant Chesapeake Louisiana, L.P. ("Chesapeake") has filed a Cross Motion for Partial Summary Judgment on the calculation of royalties payable under the Lease. (Record Document 31).

**SUMMARY JUDGMENT**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  Quality Infusion Care, Inc. v. Health Care

---

[1] The Court notes that the newly amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the

Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Id. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). If, as is the case here, there are no material facts in dispute on a specific issue and there are cross motions for summary judgment on the same issue, the only task for the Court is to interpret and apply the applicable law. See Shook v. United States, 713 F.2d 662, 665 (10th Cir. 1983).

## LAW AND ANALYSIS

Because these motions only involve questions of law and contractual interpretation, both parties agree summary judgment is proper on the issues at bar. The Lease at issue originated as a typical "paid up lease form" used in north Louisiana and was provided by Chesapeake. (Record Document 43 at 2). It is clear from the face of the Lease that, as part of the negotiation process, line-outs, or edits, were made to the proposed form Lease. (Record Document 31-2 at 2). Those changes were made by Smitherman. (Record Document 43 at 2-3). Smitherman also drafted the contested language in the Exhibit to the Lease. (Record Document 43 at 2).

---

Court's analysis. F.R.C.P. 56(a) and advisory committee's note (emphasis added).

The legal dispute in this matter arises when the original lease form, provided by Chesapeake, is construed with the Exhibit to the Lease. It is undisputed that the original Lease form determines the amount of net royalty payments through the use of the benchmark of "market value at the well."[2] It is further undisputed that the Exhibit to the Lease contains two provisions applicable to these cross motions:

> (1) The language and terms set forth in this Exhibit shall prevail in the event of a conflict between this Exhibit and the foregoing printed Lease;
>
> (2) [N]o cost shall be charged or allocated to Lessor's interest except severance and other applicable taxes.

(Record Document 31-2 at 6). The key issue is whether Chesapeake can deduct certain costs, e.g. transportation costs, before making net royalty payments to Magnolia.

"The Lease contract is the law between the parties, defining their respective legal rights and obligations...as well as the rules for interpretation of contracts as laid down in the Civil Code" See id. (citations omitted).

> The purpose of interpretation is to determine the common intent of the parties. *See* La.Civ.Code art. 2045. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter, *see* La.Civ.Code art. 2047, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. *See* La.Civ.Code art. 2048. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. La.Civ.Code art. 2053. When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind

---

[2] "Market value at the well" is a term of art commonly used in the Louisiana oil and gas industry. It will be discussed in detail, *infra*.

> or necessary for the contract to achieve its purpose. La.Civ.Code art. 2054.

Frey v. Amoco Prod. Co., 603 So. 2d 166, 172 (La. 1992). "Where the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." Tammariello Properties, Inc. v. Med. Realty Co., Inc., 549 So. 2d 1259, 1263 (La. App. 3d Cir. 1989). "A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage." Lambert v. Maryland Cas. Co., 418 So. 2d 553, 559 (La. 1982). Further, "[a] provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. See Glassell v. Richardson Oil Co., 91 So. 431, 434 (La. 1922). ("A construction which entirely neutralizes one provision of a written instrument should not be adopted if the contract is susceptible of another, which gives effect to all of the provisions.")

In Louisiana, the general rule is that post-production costs are shared *pro rata* unless a lease says otherwise. A common method of altering this default rule is calculating royalty payments by determining the "market value at the well." This dispute involves the payments due Smitherman for the production of natural gas on Smitherman's property. In determining the market value at the well of natural gas, Louisiana applies the reconstruction approach. "Under this approach, market value is reconstructed by beginning with the gross proceeds from the sale of the gas and deducting therefrom any additional costs of taking the gas from the wellhead (the point of production) to the point of sale." Merritt v. Sw. Elec. Power Co., 499 So. 2d 210, 213 (La. Ct. App. 1986). Therefore, it is clear that when parties agree to alter the default rule

by determining production payments based on the "market value at the well," they are agreeing that the lessor may bear certain costs, e.g., transportation costs.

If the Lease agreement stopped here without the Exhibit, there would be no dispute that Chesapeake possesses full contractual authority to deduct post-production costs before making royalty payments. However, an issue arises in light of the existence of the so-called "no cost" provision in the Exhibit drafted by Smitherman. At first glance, it may appear that the "market value at the well" provision and the "no cost" provision conflict, and, therefore, the Exhibit and its "no cost" provision prevail. However, it is clear under Louisiana law that the Court must give practical effect to all provisions of the Lease and avoid ignoring any particular provision of the Lease. This axiom of contractual interpretation is critical to the resolution of the pending motions. In other words, if there is a reasonable interpretation of this contract that gives effect to both the "market value at the well" provision and the "no cost" provision, then the Court must adopt that interpretation. This mandated interpretation, if available, would prevent the "market value at the well" provision from being ignored or treated as surplusage. See Lambert v. Maryland Cas. Co., 418 So. 2d at 559.

Magnolia relies heavily upon Columbine II Ltd. v. Energen Resources, 129 Fed. Appx. 119 (5th Cir. 2005) for the proposition that transportation costs cannot be deducted by Chesapeake. In Columbine II, the Fifth Circuit affirmed the district court's finding that deducting post-production costs was not permitted when the Lease expressly stated that the lessee could not deduct fees and post-production costs associated with transporting the gas to the commercial marketplace. However, the key distinction in Columbine II is that the valuation of production payments was not "market

value at the well," which expressly stands for the proposition that post-production costs are to be taken out of production payments. Had the Lease form at bar contained a line-out of the phrase "market value at the well," then Columbine II would control here and the result would be the same. Further, in Columbine II, the "no cost" provision specifically stated "post-production costs."[3] Therefore, the lease analyzed in Columbine II differs markedly from the Lease at issue in this matter in two critical ways: (1) The "no-cost" provision in Columbine II was far more specific and its intent was more readily discernable; and (2) The production payment benchmark in Columbine II was not "market value at the well." Columbine II is thus distinguishable.

The only way for the Court to rule in Magnolia's favor would be for the undersigned to find that the "market value at the well" and "no cost" provisions are in direct conflict; therefore, triggering the application of Paragraph (2) of the Exhibit's language, i.e., the Exhibit trumps the original Lease form. This result would effectively read out, or ignore, the "market value at the well" provision entirely.

The Exhibit does not contain any language specifically addressing the "market value at the well" provision. However, the Court cannot hold in favor of Chesapeake

---

[3] "Conversely, the parties also recognized that a separate clause in the sublease agreement expressly provided that Energen was not permitted to deduct fees for post-production costs associated with transporting the gas to the commercial marketplace. Given that the *only express language* on the subject in the sublease agreement expressly precludes the deduction of post-production transportation costs, we conclude that the district court did not err in holding those costs not deductible." Columbine II Ltd., 129 Fed. Appx. at 122-123 (our emphasis). Here, the "no cost" provision is not the "only express language" due to the existence of the "market value at the well" provision.

without finding that the "no cost" provision does not apply to the costs allocated to Magnolia through determining the "market value at the well." This places the Court in an unusual position due to the imprecise drafting of the specialized language authored by Smitherman in the Lease agreement.

In a lease containing less-than-artful drafting of certain special provisions, one thing is clear: the Lease agreement clearly calls for the benchmark for production payments to be "market value at the well." Smitherman, before signing this Lease, made many line-outs and edits but never altered the "market value at the well" provision. Smitherman has shown himself to be a sophisticated landowner in relation to the rights and obligations surrounding mineral leases. "Market value at the well" is a term of art in this area's oil and gas industry. "Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. Smitherman signed a Lease that expressly stated that the benchmark for production payments to him would be based on the "market value at the well." Therefore, the Court finds that it was the intent of the parties to use "market value at the well" as the benchmark to determine production payments.

Construing the Exhibit's "no cost" provision *in pari materia* is the more difficult task. Unlike the provision in Columbine II, this is a broad provision that provides no inkling of the intent behind the provision and its relationship to the contract as a whole.[4]

---

[4] As noted by Chesapeake, there are seven (7) other royalty provisions. The "no cost" provision appears to apply to those other royalty provisions as well. There is nothing in the "no cost" provision that shows its intent was to override the "market value at the well" provision. Had Smitherman used a "no cost" provision like the one in Columbine II, perhaps the intent would be clearer. While the Court is hesitant to say that the result would be different,

Construing the Lease under the four corners rule, and reading this portion of the contract in light of the whole, the intent found within the four corners of the document can only mean that no further costs can be deducted *after* the "market value at the well" has been determined. Further, the "no cost" provision is not limited to natural gas. The Lease applies to other minerals, including, oil, lignite, sulphur, and coal. This Court's interpretation is the only reading of the Lease that gives effect to both the "market value at the well" provision and the "no cost" provision. If the Exhibit language was designed to modify only a specific part of the "market value at the well" provision, it could have, and should have so stated. The Exhibit language simply does not achieve the result advocated by Magnolia's oral argument and motion for partial summary judgment. Further, this interpretation does not lead to absurd consequences. It is unambiguous that the Lease, bargained for and agreed to by the parties, calls for the benchmark for royalty payments to be the "market value at the well."

Therefore, the Court finds that the contested provisions of the Lease are unambiguous. The intent of the parties is found by the Court, from the four corners of the Lease and Exhibit, is that production payments are to be determined by using the "market value at the well" benchmark. After determining the "market value at the well," no further costs are to be deducted.

---

it certainly would make a stronger argument for finding a conflict between the Lease and the Exhibit, allowing the Exhibit to prevail.

## CONCLUSION

The Court finds that the Lease language at issue is sufficiently clear and unambiguous. The intent on the face of the document demonstrates that the production payments are to be determined using the benchmark calculation of "market value at the well." The "no cost" provision in the Exhibit to the Lease does not alter the meaning of this term of art but applies to any other costs incurred after calculating the "market value at the well." Therefore, Chesapeake may deduct post-production costs, including transportation costs, as set out in determining the "market value at the well."

Accordingly,

**IT IS ORDERED** that Chesapeake's Cross Motion for Partial Summary Judgment (Record Document 31) be and hereby is **GRANTED**.

**IT IS FURTHER ORDERED** that Magnolia's Motion for Partial Summary Judgment (Record Document 23) be and hereby is **DENIED**.

**THUS DONE AND SIGNED**, in chambers, Shreveport, Louisiana on this 30th day of July, 2012.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE