UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MAGNOLIA POINT MINERALS, LLC          CIVIL ACTION NO. 11-00854

VERSUS                                JUDGE S. MAURICE HICKS, JR.

CHESAPEAKE LOUISIANA, LP AND          MAGISTRATE JUDGE HORNSBY
PXP LOUISIANA LLC

_____

MEMORANDUM RULING

Before the Court are cross motions for partial summary judgment filed by plaintiff

Magnolia Point Minerals LLC ("Magnolia") (Record Document 23) and defendant

Chesapeake Louisiana, LP ("Chesapeake"). (Record Document 31).  The co-defendant,

PXP Louisiana, LLC ("PXP"), has opposed only Magnolia's motion. (Record Document

30). This Court initially issued its ruling in favor of Chesapeake on July 30, 2012

(Record Document 53).  However, in light of the Motion for Reconsideration (Record

Document 56) filed by Magnolia, various briefs filed by both parties, and potential

inconsistencies in relevant case law, this Court vacated its previous ruling and reopened

the summary judgment record.  The Court has now conducted a full review and

consideration of all outstanding filings related to the pending cross motions, including

the supplemental briefs (Record Document 78 and 80) addressing the Louisiana

Supreme Court's recent decision in Clovelly Oil Co., LLC v. Midstates Petroleum Co.,

2012-2055 (La. 3/19/13), 112 So. 3d 187, 191.  For the reasons that follow, the cross

motions for partial summary judgment (Record Document 23 and 31) are hereby

**DENIED**.  The Lease at issue is ambiguous and there remains a genuine dispute as to

the   intent   of   the   parties.   Additionally,   Magnolia's   Supplemental   Motion   for

Reconsideration (Record Document 67) is hereby **GRANTED** in so far as the Court has reconsidered and vacated its original ruling.  It is **DENIED** in all other respects.

## BACKGROUND

On April 11, 2008, Robert Smitherman ("Smitherman") sent a request for proposal to Chesapeake indicating his interest in leasing the mineral rights to his 447.7 acre tract in Caddo and Bossier parishes. (Record Document 43 at 1). On May 6, 2008, Matthew Smitherman, a relative of Robert Smitherman and one of the attorneys representing Smitherman, mailed a bid proposal package to Chesapeake. See id.  This bid proposal package invited Chesapeake to submit a bid to lease or purchase the minerals on Smitherman's land. (Record Document 43 at 2). Chesapeake responded by submitting a bid to lease the mineral rights to Smitherman's land and, on May 21, 2008, Smitherman granted an oil, gas, and mineral lease ("Lease") in favor of Chesapeake. (Record Document 23-3 at 8). The Lease consisted of a "paid up lease" form provided by Chesapeake, nine separate changes to the proposed lease form proposed by Smitherman, and an Exhibit, containing nineteen provisions, drafted by Smitherman. (Record Document 43 at 2-3). Chesapeake later transferred an undivided twenty percent (20%) interest in the Lease to PXP. See id.  On December 30, 2008, Smitherman "conveyed all of his [personal] interest in the oil, gas, sulphur, lignite, coal and other minerals subject to the Lease" to Magnolia Point Minerals, LLC, a limited liability company owned by Smitherman. (Record Document 23-2 at 1).  Therefore, Magnolia is the current owner of the mineral servitude covering all of the oil, gas, and minerals subject to the Lease and is entitled to receive all royalty payments in accordance with the Lease. See id.

After a dispute arose regarding the computation and payment of royalties under the Lease, Magnolia filed action seeking "an accounting for and payment of all royalties" and damages due to the late payments or under payments of these royalties. (Record Document 1-1 at 12). Further, Magnolia seeks dissolution of the Lease. (Record Document 1-1 at 13). Magnolia filed a Motion for Partial Summary Judgment (Record Document 23) and Chesapeake responded by filing a Cross Motion for Partial Summary Judgment on the calculation of royalties payable under the Lease. (Record Document 31).

## SUMMARY JUDGMENT

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]   Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See id.  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  In order to determine whether or not summary

---

[1]The Court notes that the amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the Court's analysis. See F.R.C.P. 56(a) and advisory committee's note (emphasis added).

judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

## LAW AND ANALYSIS

The Lease at issue originated as a typical "paid up lease form" used in north Louisiana and was provided by Chesapeake. (Record Document 43 at 2). It is clear from the face of the form Lease that, as part of the negotiation process, line-outs, or edits, were made to the proposed Lease. (Record Document 31-2 at 2).  Those changes were made by Robert Smitherman and/or his attorneys. (Record Document 43 at 2-3).  Smitherman also drafted the contested language specifically at issue in the Exhibit to the Lease. (Record Document 43 at 2).

The legal dispute in this matter arises when the original Lease form is construed *in pari materia* with the Exhibit to the Lease.  It is undisputed that the original Lease form determines the amount of net royalty payments through the use of the benchmark of "market value at the well."[2]  It is further undisputed that the Exhibit to the Lease contains two provisions at the heart of these cross motions:

> (1) The language and terms set forth in this Exhibit shall prevail in the event of a conflict between this Exhibit and the foregoing printed Lease;
>
> (2) [N]o cost shall be charged or allocated to Lessor's interest except severance and other applicable taxes.

---

[2] "Market value at the well" is a longstanding term of art commonly used in the Louisiana oil and gas industry. It will be discussed in detail, *infra*.

(Record Document 31-2 at 6). The key issue is whether the Exhibit's "no cost" provision forbids Chesapeake from deducting transportation costs from Magnolia's "interest" before making net royalty payments to Magnolia.

Under the general principles of contractual interpretation in Louisiana, there are various, and at times perhaps conflicting, rules of contractual interpretation applicable to the present case. As a starting point, "[t]he Lease contract is the law between the parties, defining their respective legal rights and obligations...as well as the rules for interpretation of contracts as laid down in the Civil Code...art. 2045 et seq." Frey v. Amoco Prod. Co., 603 So. 2d 166, 172 (La. 1992) (citations omitted).

> The purpose of interpretation is to determine the common intent of the parties. *See* La.Civ.Code art. 2045. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter, *see* La.Civ.Code art. 2047, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. *See* La.Civ.Code art. 2048. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. La.Civ.Code art. 2053.

Id. Additionally, "[w]here the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." Tammariello Properties, Inc. v. Med. Realty Co., Inc., 549 So. 2d 1259, 1263 (La. App. 3d Cir. 1989); La. C.C. art 2046. "On the other hand, a contract is ambiguous, under Louisiana law, 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'" Texas E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998) (citing Lloyds of London v. Transcontinental Gas Pipe Line Corp., 101 F.3d 425, 429 (5th Cir.1996), 101 F.3d at 429).

Under the established rules of construction, a "contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage." Lambert v. Maryland Cas. Co., 418 So. 2d 553, 559 (La. 1982).  Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  La. Civ. Code art. 2050; see also, Clovelly, 112 So. 3d at 192.  As recently reiterated in Clovelly, "when the printed contract provisions irreconcilably conflict with the provisions added by the parties, the added provisions will control.... Since the parties actually chose to add to or modify the printed contract, the written terms presumably better reflect their intention than those contained in a printed contract intended for general use."  112 So. 3d at 193.  However, as demonstrated by the Louisiana Supreme Court in its holding,[3] it is paramount that the language should be harmonized, if possible, so that each term is given the meaning suggested by the contract as a whole.  These bedrock principles of contractual interpretation must be applied by the Court to the language of the Lease at issue.

---

[3]In Clovelly, Exhibit A of the contract at issue contained typewritten terms made by the original parties to the Joint Operating Agreement (JOA).  Section I of Exhibit A listed certain geographic parameters to which the lease at issue would be applicable. 112 So. 3d at 190.  However, the parties disagreed as to whether the JOA applied to all land located within the geographic parameters listed in Exhibit A, or only to the land within the relevant geographic parameters that was also owned at the time the JOA was executed.  The Louisiana Supreme Court looked to the entire contract in determining which interpretation of the JOA was correct.  Id. at 193. The Court limited the applicability of the JOA to only cover land which was owned by the parties at the time the JOA was executed based on the present tense language in the Preamble and other sections of the JOA.  Id.  To hold otherwise would render Exhibit A in conflict with other provisions of the contract.  Id. at 194.

In Louisiana, the general rule is that post-production costs are shared *pro rata* unless a lease says otherwise. A common method of altering this default rule is calculating royalty payments by determining the "market value at the well."   In determining the market value at the well of natural gas, Louisiana applies the reconstruction approach. "Under this approach, market value is reconstructed by beginning with the gross proceeds from the sale of the gas and deducting therefrom any additional costs of taking the gas from the wellhead (the point of production) to the point of sale." Merritt v. Sw. Elec. Power Co., 499 So. 2d 210, 213 (La. Ct. App. 2nd Cir. 1986). Therefore, it is clear that when parties agree to alter the default rule by determining production payments based on the "market value at the well," they are agreeing that the lessor may bear certain costs, e.g., transportation costs.

If the Lease agreement at issue stopped here without the Exhibit, there would be no dispute that Chesapeake possesses full contractual authority to deduct post-production costs before making royalty payments.  However, the so-called "no cost" provision in the Exhibit drafted by Smitherman appears to impact the implementation of the reconstruction approach used to determine the "market value at the well."  Magnolia contends that the "market value at the well" provision and the "no cost" provision irreconcilably conflict, and, therefore, the "no cost" provision prevails and any deduction of post-production expenses is contractually forbidden.  Nevertheless, it is clear under Louisiana law, specifically the recent decision in Clovelly discussed above, that the Court should attempt to harmonize the printed lease form with the added exhibit in order to give effect to all provisions in the contract. See  Clovelly, 112 So. 3d at 194.  In other

words, if there is a reasonable interpretation of this contract that gives effect to both the "market value at the well" provision and the "no cost" provision, the Court must adopt that interpretation.   However, the Court can only reach or conduct that analysis if the language in the Lease is clear and unambiguous and leads to no absurd results when harmonizing all provisions.

After due consideration of the specific language used within the four corners of the Lease, the Court finds that the terms of Lease are unclear and ambiguous and that there remains a genuine dispute as to a material fact.  Here, the definition of "lessor's interest" appears to be determinative.  However, this term is ambiguous and the parties have presented scant evidence, if any, as to what constitutes Magnolia's interest and at what time that interest is established.  The Court is uncertain as to the parties' intentions with respect to the meaning of "interest" which affects the scope of the "no cost" provision in the Exhibit.  The parties intent is the key issue because the phrase "lessor's interest" is susceptible to more than one reasonable meaning under this set of circumstances.

The Exhibit's "no cost" provision states that "no cost shall be charged or allocated to [Magnolia's] interest except severance taxes and other applicable taxes."  However, the Exhibit itself does not quantify or provide any definition for the term "interest." Accordingly, the Court can only determine if Chesapeake violated the added "no cost" provision when it paid royalties of 1/4 of the "market value at the well" (which, under the calculation method employed by Chesapeake, inherently included the deduction of transportation costs) after the Court has first established what constitutes Magnolia's

"interest."  If Magnolia's "interest" is one-fourth of the proceeds of gas <u>after</u> deducting the cost of bringing the gas to market, then the "no cost" provision would have no bearing on costs paid to bring the product to a suitable market and would only prevent the deduction of any post-hoc expenses, such as administrative or accounting charges.  However, if Magnolia takes an immediate interest in the gas as it is produced, then it would be reasonable to interpret the "no cost" provision to prevent the deduction of all costs, including transportation expenses.  Because the "no cost" provision is susceptible to multiple reasonable interpretations, the court cannot determine the intent of the parties from the four corners of the Lease and Exhibit alone.  Rather, the rights and duties of the parties under the Lease can only be determined through the examination of extrinsic evidence, including possible expert testimony on the custom, pattern, or practice in the oil and gas industry as to the meaning of "interest."  Therefore, summary judgment at this stage is premature.

Additionally, Magnolia relies heavily upon <u>Columbine II Ltd. v. Energen Resources</u>, 129 Fed. Appx. 119 (5th Cir. 2005) for the proposition that transportation costs cannot be deducted by Chesapeake.  However, <u>Columbine II</u> is distinguishable from the present facts.  In <u>Columbine II</u>, the lease holder was not permitted to deduct fees for post-production costs associated with transporting the gas to the commercial marketplace. "Given that the *only express language* on the subject in the sublease agreement expressly precludes the deduction of post-production transportation costs, [the Fifth Circuit concluded] that the district court did not err in holding those costs not deductible."  <u>Id.</u> at 122-123.  Here, the "no cost" provision is not the "only express

language" concerning royalties due to the existence of the "market value at the well" provision.  Further, the language in Columbine II expressly referred to post-production transportation costs.  Id.  This express language clearly demonstrated the intent of the parties to override the traditional "market value at the well" calculation as it pertained to transportation costs.  Here, the "no cost" provision does not address transportation costs specifically.  The Lease form at issue does not contain a line-out of the phrase "market value at the well," or specific language in the Exhibit including clear, unambiguous language indicating that the "no cost" restriction applied before the gas was transported to a suitable marketplace.   If the Magnolia/Chesapeake Lease contained language expressly forbidding the deduction of post production transportation costs, Columbine II would be persuasive.

## CONCLUSION

The Court finds that the Lease language at issue is unclear and is, in fact, ambiguous.  The Court cannot determine the intent of the parties through the four corners of the Lease and Exhibit at this stage.  The Exhibit contains the ambiguous phrase "[N]o cost shall be charged or allocated to Lessor's interest."  There are competing reasonable interpretations as to what constitutes the "Lessor's interest," and when such "interest" accrues.  It is only after such determination is made that the Court can decide whether the Lease's "market value at the well" clause and the Exhibit's "no cost" provision can be harmonized or whether the two clauses irreconcilably conflict. Therefore, at this point, the Court is precluded from entering summary judgment with respect to the rights and duties of the parties under the lease.

Accordingly,

**IT IS ORDERED** that both Chesapeake and Magnolia's competing Cross Motions for Partial Summary Judgment (Record Document 23 and 31) be and are hereby **DENIED**.

**IT IS FURTHER ORDERED** that Magnolia's Supplemental Motion for Reconsideration (Record Document 67) be and is hereby **GRANTED** in so far as the Court has reconsidered and vacated its original ruling. It is **DENIED** in all other respects.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in chambers, Shreveport, Louisiana on this 2nd day of August, 2013.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE